UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| GOODCAT, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:16-cv-01514-RLY-DML |
| | ) | |
| DAVID  COOK, DAVID  COLEMAN, | ) | |
| DALE  GRUBB, and MARJORIE  MAGINN, | ) | |
| in their official capacities for the Indiana | ) | |
| Alcohol and Tobacco Commission; and the | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| CLOUDTOWN, LLC, | ) | |
| DB VAPES, LLC, | ) | |
| DNM VENTURES, LLC, | ) | |
| VAPOR BANK E-LIQUID, LLC, | ) | |
| LICENSED E-LIQUID MANUFACTURING | ) | |
| LLC, and VAPEING, LLC, | ) | |
| | ) | |
| Intervenors. | ) | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**

GoodCat LLC, the Plaintiff, challenges the constitutionality of certain requirements

that Indiana Code § 7.1-7-1 *et seq.* (the "Indiana Act" or the "Act") imposes on

manufacturers of electronic vapor liquids ("e-liquids") who wish to sell their products in

Indiana.  Effective July 1, 2016, any manufacturer of e-liquids destined for sale or

distribution in Indiana must have a manufacturing permit issued by the Indiana Alcohol

and Tobacco Commission ("ATC").  On June 20, the ATC rejected GoodCat's permit

application.  That same day, GoodCat filed this lawsuit seeking a temporary restraining order ("TRO") and a preliminary injunction against Defendants, Commissioners of the ATC and the State of Indiana, enjoining the ATC from enforcing certain provisions against GoodCat.  Other manufacturers of e-liquids, Cloudtown LLC, *et al.* (collectively, "Intervenors"), subsequently requested to intervene in this action to oppose GoodCat's challenges to the Act.  On June 30, the statutory deadline for the ATC to issue permits, the court granted GoodCat's request for a TRO and ordered the ATC to issue GoodCat a provisional manufacturing permit.

Also on June 30, this court issued an opinion in a related case, *Legato Vapors LLC v. Cook*, No. 1:15-cv-761, 2016 WL 3548658 (S.D. Ind. June 30, 2016).  In that case, the plaintiffs challenged the Act on several constitutional grounds, including the dormant Commerce Clause, the Equal Protection and Due Process Clauses of the Fourteenth Amendment, and the Indiana Constitution's Privileges and Immunities Clause.  The court rejected each of the plaintiffs' arguments and granted summary judgment in favor of the State.  GoodCat, unlike the plaintiffs in *Legato Vapors*, challenges only a narrow group of provisions—commonly known as the "security requirements"—on legal theories not squarely before the court in *Legato Vapors*.  The court, therefore, confines the scope of its consideration in this matter to issues not raised in *Legato Vapors*.

On July 11, the court held a preliminary injunction hearing.  GoodCat, Defendants, and Intervenors appeared by counsel.  Having considered GoodCat's Verified Complaint, the parties' briefs in support of and opposition to the motion for a preliminary injunction,

and evidence and argument of counsel at the hearing, the court now issues the following findings of fact and conclusions of law.

## I.     Findings of Fact[1]

**A.     Introduction to e-liquids and GoodCat LLC**

1.      E-liquids typically contain nicotine, flavorings, propylene glycol, and/or vegetable glycerin.  The nicotine concentrations and flavor combinations vary widely among e-liquids.  (Stipulated Facts ¶¶ 2, 4).

2.      Electronic nicotine delivery devices (or "ENDS"), including electronic cigarettes, heat and aerosolize e-liquids.  Once the device aerosolizes the e-liquid, the user of the device inhales the vapor through a mouthpiece.  (*Id.* ¶¶ 1, 3).

3.      Since 2009, GoodCat has manufactured e-liquids from its manufacturing facility in Naples, Florida.  (Filing No. 46 ("Hr'g Tr.") at 53:16–54:5).

4.      GoodCat has forty employees, including nine degreed scientists, and the capacity to produce up to 3 million bottles a month and approximately 100 metric tons of e-liquid products per year.  (*Id.* at 54:6–15, 55:8–11, 57:15–18).

5.      GoodCat produces e-liquid products for approximately 104 brands with approximately 20,000 unique products, or "SKUs."  (*Id.* at 56:15–23).  In addition to shipping bottled e-liquids, approximately 20 to 25 percent of its sales consists of stock, or "white label," e-liquids sold by the barrel to other distributors or smaller retailers who wish

---

[1]      GoodCat and the Defendants filed Joint Stipulations of Fact (Filing No. 36 ("Stipulated Facts")) prior to the preliminary injunction hearing and before the court granted the Intervenors' Motion to Intervene.  Thus, the court cites to the stipulated facts only to the extent Intervenors neither objected to them during the July 11 hearing nor presented conflicting evidence.

to bottle their own products.  (*Id.* at 87:11–88:10).  GoodCat's products are sold through convenience stores, big box stores, and so-called vape shops in Indiana.[2]  (*Id.* at 56:8–14).  It is estimated that approximately 200 retail outlets in Indiana sell GoodCat's products.  (*Id.* at 56:21–23).

6.      Raymond Keller founded GoodCat and currently serves as the company's president.  Mr. Keller has a degree in biology and a background in nuclear engineering.  Mr. Keller built GoodCat's production facility to implement stringent security measures similar to those he experienced in the nuclear industry.  (*Id*. at 52:24–53:1, 92:19–93:3).

7.      GoodCat uses keycard locks on all doors at its manufacturing facility to limit access to authorized personnel.  A security computer records who enters or exits each door at GoodCat's facility, including the date and time.  GoodCat also has a sophisticated, real-time surveillance system consisting of sixty-four camera views of the facility.  (*Id.* at 62:12–64:6).

8.      GoodCat does not have a physical presence in Indiana.  (*Id.* at 54:2–3).

9.      Since 2009, GoodCat has been registered as a tobacco product establishment with the United States Food and Drug Administration ("FDA").  GoodCat has filed each of its product formulations with the FDA.  (*Id.* at 64:17–65:1).

**B.      The Federal Government's regulation of e-liquid**

10.      In 2009, Congress enacted the Family Smoking Prevention and Tobacco Control Act ("TCA"), codified at 21 U.S.C. § 387 *et seq.*, to grant the Food and Drug

---

[2]      "Vape shops" are typically small retail outlets where e-liquid users can purchase e-liquids and ENDs.  (*See* Hr'g Tr. at 55:24–56:7).

Administration ("FDA") authority to regulate tobacco products under the Food, Drug, and Cosmetics Act ("FDCA"), 21 U.S.C. § 301 *et seq.*  *See* 21 U.S.C. § 387a(a).

11.     The TCA extends the FDA's authority to regulate "all cigarettes, cigarette tobacco, roll-your-own tobacco, and smokeless tobacco and to any other tobacco products that the [FDA] by regulation deems to be subject to [the TCA]."  *Id.* § 387a(b).

12.     The TCA established certain regulations, such as "annual registration" and "premarket review" requirements, *see id.* §§ 387e and 387j, and gives the FDA the authority to promulgate further regulations in certain areas, such as for manufacturing standards.  *Id.* § 387f(e).

13.     On May 10, 2016, the FDA exercised its authority under § 387a(b) to promulgate what is known as its "Deeming Rule," by which the FDA deems e-liquid a "tobacco product" and therefore subject to regulation as such under the FDCA.  *See Deeming Tobacco Products to be Subject to the FDCA*, 81 Fed. Reg. 28,974 (May 10, 2016).  The Deeming Rule takes effect on August 8, 2016.  *Id.*

14.     As a consequence of the Deeming Rule, which took effect on August 8, 2016, the FDCA's requirements concerning manufacturer and product registration, submission of ingredient listings, marketing, and premarket review applies to e-liquids.  *Id.* at 28,976.

15.     The Deeming Rule also established three new regulations governing the sale of e-liquids: (1) prohibitions on sales to persons under 18 years of age; (2) requirements that packages bear health warnings; and (3) prohibitions on vending machine sales.  *Id.*

16.     Although the FDA has had authority to promulgate regulations since 2009, it has not promulgated regulations concerning good manufacturing standards.

5

17.     With respect to tobacco products, the FDCA specifically addresses preservation and preemption in Section 916 of the TCA, codified at 21 U.S.C. § 387p(a).  That section, in pertinent part, provides as follows:

> (1) Preservation
>
> Except as provided in paragraph (2)(A), nothing in this subchapter, or rules promulgated under this subchapter, shall be construed to limit the authority of . . . a State or political subdivision of a State . . . to enact, adopt, promulgate, and enforce any law, rule, regulation, or other measure with respect to tobacco products that is in addition to, or more stringent than, requirements established under this subchapter, including a law, rule, regulation, or other measure relating to or prohibiting the sale, distribution, possession, exposure to, access to, advertising and promotion of, or use of tobacco products by individuals of any age, information reporting to the State, or measures relating to fire safety standards for tobacco products.
>
> (2) Preemption of certain State and local requirements
>
> (A) In General
>
> No State . . . may establish or continue in effect with respect to a tobacco product any requirement which is different from, or in addition to, any requirement under the provisions of this subchapter relating to tobacco product standards, premarket review, adulteration, misbranding, labeling, registration, good manufacturing standards, or modified risk tobacco products.
>
> (B) Exception
>
> Subparagraph (A) does not apply to requirements relating to the sale, distribution, possession, information reporting to the State, exposure to, access to, the advertising and promotion of, or use of, tobacco products by individuals of any age, or relating to fire safety standards for tobacco products.

21 U.S.C. § 387p(a).

6

**C.      Indiana's regulation of e-liquid**

18.      During its 2015 legislative session, the Indiana General Assembly enacted Indiana

Public Law 176-2015, as amended by Indiana Public Law 214-2016 and codified at Indiana

Code § 7.1-7-1 *et seq.*  The Act imposes a comprehensive regulatory and permitting scheme

on the manufacture of e-liquids for use in electronic cigarettes and other vaping devices.

It applies to (1) "[t]he commercial manufacturing, bottling, selling, bartering, or importing

of e-liquid in Indiana"; and (2) "[t]he sale, possession, and use of e-liquid products in

Indiana."  Ind. Code § 7.1-7-1-1; (*see* Stipulated Facts ¶ 5).

19.      The purpose of the Act is:

> in the absence of federal regulations, to protect public health
> and safety by: (1) ensuring the safety and security of e-liquid
> manufactured for sale in Indiana; (2) ensuring that e-liquid
> manufactured or sold in Indiana conforms to appropriate
> standards of identity, strength, quality, and purity; and (3)
> ensuring that e-liquid is not contaminated or adulterated by the
> inclusion of ingredients or other substances that might pose
> unreasonable threats to public health and safety.

Ind. Code § 7.1-7-1-2.

20.      The Act requires a "manufacturer," defined as "a person or cooperative, located

inside or outside Indiana, that is engaged in manufacturing e-liquid," *id.* § 7.1-7-2-15, to

obtain a permit from the ATC "before mixing, bottling, packaging, or selling e-liquid to

retailers or distributors in Indiana."  *Id.* § 7.1-7-4-1(a).

21.      Defendants interpret the Act as requiring an out-of-state manufacturer to obtain a

manufacturing permit under the Act if the manufacturer sells e-liquid to: (i) a distributor or

retailer located in Indiana; (ii) a distributor located outside of Indiana who then sells or

distributes the product to a retailer located in Indiana; (iii) a consumer or end-user in Indiana over the Internet; or (iv) an out-of-state retailer who then sells the product to a consumer or end user in Indiana over the Internet.  (Stipulated Facts ¶ 8).

22.    In the event an e-liquid manufacturer sells its product in Indiana without first having obtained a manufacturing permit, the manufacturer commits a Class A infraction and may be subject to civil liability for damages and attorney's fees in a lawsuit by one or more permittee-manufacturers.  Ind. Code §§ 7.1-7-6-3, 7.1-7-6-4.

### 1.    Security firm requirements

23.    To obtain a permit, a manufacturer must submit an application to the ATC containing, *inter alia*, evidence that it has a service agreement with a single security firm, valid for a period of five years.  *Id.* § 7.1-7-4-1(d)(2).

24.    The Act defines "security firm" as any entity that (1) "is independent from an applicant and manufacturer"; (2) "has experience in the security business"; and (3) as of July 1, 2015, (i) satisfies the requirements under Section 7.1-7-4-1(d)(3), (ii) is a locksmith as defined under Section 7.1-7-2-14, and (iii) provides security services to the manufacturer.  *Id.* § 7.1-7-2-22.

25.    To qualify for a permit, the applicant-manufacturer must contract with a single security firm that, *inter alia*:

- has continuously employed, for not less than the previous one-year period, at least one employee who is accredited or certified by the Door and Hardware Institute as an Architectural Hardware Consultant;

- has continuously employed, for not less than the previous one-year period, at least one employee who is accredited or certified as a certified Rolling Steel Fire Door

Technician by the International Door Association or the Institute of Door Dealer Education and Accreditation;

- employs an employee that, for at least a one-year period, has been certified as a professional locksmith by the Associated Locksmiths of America;

- has at least one year of commercial experience in the preceding year with owning and operating a security monitoring station with ownership, control, and use of a redundant offsite backup security monitoring station; and

- has at least one year of commercial experience in the preceding year with operating a facility that modifies commercial hollow metal doors, frames, and borrowed lights with authorization to apply the Underwriters Laboratories label.

*Id.* §§ 7.1-7-4-1(d), 7.1-7-2-14, and 7.1-7-2-22(3).  A qualifying security firm may not subcontract with another entity or person to meet the credential requirements above. *Id.* § 7.1-7-2-11; (Stipulated Facts ¶ 9).

26.     Although the Act requires that an eligible security firm have employed a certified Rolling Steel Fire Door Technician for at least a year, the Act does not require an e-liquid manufacturer to have rolling steel fire doors in its facility.  (Hr'g Tr. at 64:10–16).

27.     Defendants have no position on how a rolling steel fire door protects against tampering or adulteration of e-liquid during the manufacturing process.  (Stipulated Facts ¶ 11).

28.     A security firm qualifies under the Act only if it has complied continuously with Sections 7.1-7-4-1(d)(3), 7.1-7-2-14, and 7.1-7-2-22 since July 1, 2015.  *Id.* § 7.1-7-2-22(3); (Stipulated Facts ¶ 10).

29.     The Act requires that all applications for e-liquid manufacturing permits be submitted and approved by the ATC no later than June 30, 2016.  The ATC has not accepted and will not accept manufacturing permit applications after June 30, 2016.  Ind.

Code § 7.1-7-4-1(b); (Stipulated Facts ¶¶ 5–6).  Defendants do not know of any reason for the General Assembly's decision to set the June 30, 2016 deadline for e-liquid manufacturing permit applications.  (Stipulated Facts ¶ 7).

### 2.   Mulhaupt's and the Act

30.   Mulhaupt's, Inc. is a security firm with facilities in Indianapolis, Terre Haute, and Lafayette, Indiana.  (Hr'g Tr. at 16:2–6).  At any given time, Mulhaupt's employs approximately 90 to 100 employees.  (*Id.* at 17:20–21).

31.   In August 2015, ATC Commissioner Marjorie Maginn and Jessica Allen, counsel for the ATC, toured a Mulhaupt's facility and discussed Mulhaupt's "capacities."  (*Id.* at 25:15–20).

32.   In 2015 and 2016, Mulhaupt's had no employee with both certifications and therefore, prior to the Amendment, did not qualify as an eligible security firm under the statute.  (*Id.* at 25:24–26:17, 29:9–23).

33.   Doug Mulhaupt, president of Mulhaupt's, testified that prior to the Amendment, he had concerns that Mulhaupt's could not comply with the statute.  (*Id.* at 25:24–26:17; Stipulated Facts, Ex. 9).  Mr. Mulhaupt further testified that he believed that the company's attorneys, Jack Thar and Jennifer Drewry, discussed the ATC's approval of Mulhaupt's with members of the ATC prior to the Amendment's enactment in March 2016.  (Hr'g Tr. at 26:21–27:10, 47:21–48:11).

34.   In 2016, the General Assembly passed Indiana Public Law 214-2016, which amended Section 7.1-7-4-1(d)(3), effective March 24, 2016 (the "Amendment").  Prior to the Amendment, the law required a security firm to have an employee certified as both an

architectural hardware consultant and a rolling steel fire door technician.  *See* 2016 Ind. Acts 3154.  The Amendment allows a qualifying security firm to satisfy the certification requirements with multiple employees holding different certifications.  *Id.*; Ind. Code § 7.1-7-4-1(d)(3).

35.  Mulhaupt's vice president, Michael Gibson, serves as the president-elect of the Door and Hardware Institute, which is the certifying organization identified in the statute for the Architectural Hardware Consultant certification.  (Hr'g Tr. at 30:2–5).

36.  Since the Act took effect, the ATC has approved only one security firm, Mulhaupt's, as compliant with the statutory requirements in Sections 7.1-7-4-1(d), 7.1-7-2-14, and 7.1-7-2-22.  (*Id.* at 18:9–12).

37.  Despite the exhaustive searches of GoodCat and other e-liquid manufacturers, no other known security firm anywhere in the United States satisfies the security firm requirements.  (*Id.* at 18:9–16, 28:21–23, 84:1–4, 14–19; *see also* Stipulated Facts ¶ 30 n.1).

38.  Mulhaupt's advised potential applicants for e-liquid manufacturing permits that, among other criteria, its decision to enter into service agreements with applicants would depend on "Mulhaupt's ability to meet the applicant's needs in the terms of service." (Stipulated Facts ¶ 34, Ex. 9; Hr'g Tr. 44:8–21).  Mulhaupt's also advised potential applicants of a timeline for completing the application process.  (Pl.'s Ex. 9).

39.  Mulhaupt's received inquiries of some type from between twenty and forty e-liquid manufacturers and approximately eighteen applications, including multiple applications from manufacturers located outside Indiana.  (Hr'g Tr. at 18:17–20, 19:5–15, 43:4–9).

Preliminarily, Mulhaupt's determined that it might only do business with approximately eight of the eighteen applicants.  (*Id.* at 19:1–4, 45:4–12).  Mr. Mulhaupt testified that some of the manufacturers it rejected were located outside of Indiana and its contiguous states. (*Id.* at 45:4–9).

**D.    Intervenors**

40.    The ATC ultimately granted permits to six e-liquid manufacturers—Cloudtown, LLC; DB Vapes, LLC; DNM Ventures, LLC; Licensed E-Liquid Manufacturing LLC; VapeINg LLC; and Vapor Bank E-Liquid, LLC.  (Pl.'s Ex. 11).  Each of the six permittees entered into a security services agreement with Mulhaupt's.  (*Id.*; Stipulated Facts ¶ 30). The six permittees have also intervened in this litigation to oppose GoodCat's challenge to the Act.

41.    Four of the six permittees—DB Vapes, LLC; Licensed E-Liquid Manufacturing LLC; VapeINg LLC; and Vapor Bank E-Liquid, LLC—are located in Indiana.

42.    Cloudtown, LLC is an Ohio-based company with a physical address in Cleves, Ohio.   (Hr'g Tr. at 131:6–132:1).   Despite having a permit, Cloudtown does not yet manufacture e-liquid for sale in Indiana.  (*Id.* at 31:4–15).

43.    DNM is a Florida company with headquarters in Bonita Springs, Florida, and manufacturing facilities in Largo, Florida.  (Pl.'s Exs. 12 and 21).  DNM manufactures, distributes, markets, and sells e-liquids.  (Hr'g Tr. at 108:12–23).  The majority interest holder in the company, with 75 percent ownership, has an Indianapolis, Indiana address; the holder of the remaining 25 percent interest has a Bonita Springs, Florida address.  (Pl.'s Ex. 12).  DNM's current chief executive officer is Brian King.  (*Id.*; Hr'g Tr. 108:9–12).

44.     The ATC received DNM's permit application on April 11, 2016, and approved it on

April 19.  (Pl.'s Ex. 12 and 13).

45.     DNM began production of e-liquids in early June 2016.  (Hr'g Tr. at 114:14–17).

46.     DNM's permit application listed 8565 Somerset Drive, Unit A, Largo, Florida, as

the address for its manufacturing facility.  (Pl.'s Ex. 21).  Another Florida company, Lizard

Juice, LLC, shares the same physical address.  (Pl.'s Ex. 20).

47.     Regarding the relationship between DNM, a permittee, and Lizard Juice, Mr. King

testified as follows:

> Q:     What's the relationship, if any, between Lizard Juice,
> LLC and DNM Ventures?
>
> A:     Lizard Juice is a brand—a regional brand that we
> brought to Indiana as part of our brand package.  We
> have operational control of the plant and the
> manufacturing of our brand[s], the Lizard Juice, Akua,
> AMP, Space Jam and other brands that we're bringing
> to market as well.

(Hr'g Tr. at 116:14–20).

48.     DNM has no ownership interest in Lizard Juice, LLC.  (*Id.* at 117:7–12).

**E.     Mulhaupt's rejects GoodCat's application for security services**

49.     GoodCat began its search for a qualifying security firm in fall 2015.  (Hr'g Tr. at

67:24–68:1).

50.     GoodCat first heard that Mulhaupt's might satisfy the security firm criteria in

February or March 2016.  (*Id.* at 68:8–12).  GoodCat immediately attempted to contact

Mulhaupt's regarding its services.  (*Id.* at 68:13–15).

51.     On March 16, 2016, an employee of Mulhaupt's sent Mr. Keller of GoodCat an email enclosing a Mulhaupt's application and a standard non-disclosure agreement. (Stipulated Facts ¶ 36; Pl.'s Ex. 10).   A few hours later, Mr. Keller sent GoodCat's completed application and non-disclosure agreement to Mike Gibson, Vice President of Mulhaupt's.  (Hr'g Tr. at 69:16–70:3; Pl.'s Ex. 14).

52.     On April 13, 2016, GoodCat received a letter via email from Mulhaupt's indicating that it rejected GoodCat's application.  (Stipulated Facts ¶ 37).  Mr. Keller made multiple follow-up inquiries with Mulhaupt's regarding its rejection of GoodCat's application but received no further information.  (Hr'g Tr. at 72:17–22).

**F.     GoodCat's attempts to comply with the Act's security requirements**

53.     Following Mulhaupt's decision not to do business with GoodCat, GoodCat negotiated and entered into a services agreement with a Florida-based security firm, Security Specialist Incorporated ("SSI").   SSI meets the video surveillance requirements set forth in Indiana Code § 7.1-7-4-1(d)(3)(B)(i) with one exception: SSI neither owns nor operates a remote monitoring station.  Instead, SSI contracts with another security company for this service.  (Stipulated Facts ¶ 21; Pl.'s Exs. 1–2).

54.     GoodCat and SSI each then contracted separately with local Florida-based persons that hold the Architectural Hardware Consultant and Rolling Steel Fire Door Technician certifications required by Indiana Code § 7.1-7-4-1(d)(3)(A)(i)–(ii), as well as a local Florida-based person that has been certified as a professional locksmith by the Associated Locksmiths of America for at least a one-year period as required by Indiana Code § 7.1-7-2-22(3)(B).  (Stipulated Facts ¶¶ 22–24, 27–29; Pl.'s Exs. 3–8).

14

55.   GoodCat and SSI each contracted with Fields Door and Hardware, Inc., which holds an Architectural Hardware Consultant certification.  Although Fields Door and Hardware has operated for more than one year a facility that modifies commercial hollow metal doors, frames, and borrowed lights, it does not have authorization to apply the Underwriters Laboratories label.  Instead, it has authority to apply the "Intertek label," a competing fire rating label.  (Stipulated Facts ¶¶ 25–26; Hr'g Tr. at 20:18–22).  Like Underwriters Laboratories, Intertek is one of the Occupational Safety and Health Administration's ("OSHA") Nationally Recognized Testing Laboratories ("NRTL").  (Stipulated Facts ¶ 26).

56.   GoodCat thus satisfies all of the statutory criteria for the award of an e-liquid manufacturing permit except that:

a.   SSI has not continuously employed, for not less than a one-year period, at least one employee who is accredited or certified by the Door and Hardware Institute as an Architectural Hardware Consultant;

b.   SSI has not continuously employed, for not less than the previous one-year period, at least one employee who is accredited or certified as a Rolling Steel Fire Door Technician by the International Door Association or the Institute of Door Dealer Education and Accreditation;

c.   SSI does not employ an employee that, for at least a one-year period, has been certified as a Professional Locksmith by the Associated Locksmiths of America;

d.   SSI does not own and operate the remote video security monitoring station, but rather contracts with another security company for this service;

15

e.      SSI does not operate a facility that modifies commercial hollow metal doors, frames, and borrowed lights or have authorization to apply the Underwriters Laboratories label.  (Stipulated Facts ¶ 15).

## G.      The ATC rejects GoodCat's permit application

57.     On April 28, 2016, GoodCat submitted a partial application for an e-liquid manufacturing permit to the ATC.  GoodCat submitted additional materials in support of its application on June 16, 2016, including (1) an e-liquid security firm certification; (2) an addendum to the security firm certification; and (3) the service agreements between SSI and GoodCat and the subcontracting firms.  (*Id.* ¶ 14; Pl.'s Exs. 1–8; Hr'g Tr. at 73:1–75:11).

58.     The time required for GoodCat to negotiate and execute the various service agreements caused the delay between GoodCat's submission of the partial application and the supplemental materials.  (Hr'g Tr. at 73:12–16, 75:12–16).

59.     Part of the application to the ATC required GoodCat to certify that its e-liquid products contain only ingredients deemed permissible by Indiana Code § 7.1-7-5-1(a).  (Hr'g Tr. at 65:12–15).

60.     On June 20, 2016, the ATC returned the application materials to GoodCat's for failure to comply with Indiana Code § 7.1-7-4-1(d)(3)(A) insofar as GoodCat's security services firm, SSI, subcontracted—and does not directly employ—persons with the requisite credentials.  (Pl.'s Ex. 17; Hr'g Tr. at 75:25–76:21).

**H.     Changes in Indiana's market for e-liquids**

61.     Prior to June 30, 2016, approximately 190 brands of e-liquids were sold in Indiana by Indiana retailers, excluding private label "house brands" manufactured by Indiana vape shops.  Approximately 90 percent of the revenue from branded e-liquids came from e-liquids manufactured outside of Indiana.  (Stipulated Facts ¶ 44; Hr'g Tr. at 98:1–5).

62.     Prior to June 30, 2016, the brands of e-liquid sold by retailers in Indiana were associated with 177 distinct businesses.[3]  Of those businesses, thirteen were located in Indiana; and approximately 164 were out-of-state businesses selling e-liquid in Indiana. (Stipulated Facts ¶ 45).

63.     Amy Lane, the owner of a vape shop in Peru, Indiana, testified that since the Act took effect, she experienced a 44 percent price increase on an identical product that, prior to July 1, 2016, she could purchase from a West Coast manufacturer.  (Hr'g Tr. at 99:5–23).  Ms. Lane testified that, in her opinion, the Act has caused a relative scarcity of e-liquids in Indiana and associated higher prices.  In her view, rising prices and the inability of permitted manufacturers to fulfill retail orders for products has caused at least 24 vape shops to close in Indiana.  (*Id.* at 102:2–103:14).

---

[3]     It is not clear from the briefs or evidence presented to the court whether this figure includes only manufacturers of e-liquids.

## II.    Conclusions of Law

1.    To the extent any of the foregoing findings of fact constitute conclusions of law, the court hereby adopts them as conclusions of law.  Similarly, if any conclusions of law set forth below constitute findings of fact, the court adopts them as findings of fact.

2.    The ATC is an executive agency of the State of Indiana.  Ind. Code § 7.1-2-1-1.  The Indiana General Assembly created the ATC and charged it with, *inter alia*, implementing and enforcing the regulatory scheme for e-liquids set forth in the Act.  Ind. Code § 7.1-7-3-1.

3.    The State of Indiana is a body politic.  The State, acting through the General Assembly, enacted the statutory provisions challenged in this matter.

4.    Because GoodCat challenges the Act's security requirements—and the ATC's enforcement of them—as violations of the United States Constitution, the court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

## A.    Standard

5.    To succeed on a motion for a preliminary injunction, the moving party must show that it has (1) some likelihood of success on the merits, (2) no adequate remedy at law, and (3) that it will suffer irreparable harm without the injunction.  *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dept. of Health*, 699 F.3d 962, 972 (7th Cir. 2012).  If it makes this threshold showing, the court weighs the balance of harm a grant or denial of the injunction would inflict on the parties and the effect of an injunction on the public interest. *Id.*  The interdependence of these considerations requires the court to evaluate them on a sliding scale. *Judge v. Quinn*, 612 F.3d 537, 546 (7th Cir. 2010); *Coronado v. Valleyview*

18

*Pub. Sch. Dist. 365-U*, 537 F.3d 791, 795 (7th Cir. 2008).  Thus, "the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief."  *Hoosier Energy Rural Elec. Co-op, Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009).  As with any preliminary injunction motion, the court's inquiry begins with the merits of the claims.

**B.    GoodCat's Claims**

7.    In its Verified Complaint, GoodCat alleges that the security requirements set forth in Indiana Code §§ 7.1-7-2-14, 7.1-7-2-22, and 7.1-7-4-1(d) violate the dormant Commerce Clause in Article I, Section 8 of the United States Constitution; the Due Process Clause of the Fourteenth Amendment; and the Supremacy Clause of Article VI by way of federal preemption.  Because the court addresses statutory issues before constitutional ones, it turns first to the issue of preemption.  *See Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1046 (7th Cir. 2013).

**1.    Preemption**

8.    GoodCat argues that Section 916 of the TCA, codified at 21 U.S.C. § 387p, preempts the Act's security requirements for e-liquid manufacturers.  Defendants and Intervenors counter that (1) security requirements do not "relate to" matters Congress expressly reserved for itself to regulate; and (2) even if the security requirements fall within the preemption clause, they cannot be "different from, or in addition to" existing federal regulations because the FDA has not exercised its authority to regulate tobacco products.

9.    The Supremacy Clause provides that "the Laws of the United States . . . shall be the supreme Law of the land . . . any Thing in the Constitution or Laws of any State to the

Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  The clause provides Congress the power to preempt state law.  *Michigan S. R.R. Co. v. City of Kendallville*, 251 F.3d 1152, 1153 (7th Cir. 2001).  Thus, in determining whether a federal statute preempts state law, the court looks to the intent of Congress.  *Patriotic Veterans, Inc.*, 736 F.3d at 1046.

10.     Generally, the court ascertains Congress's intent "through a lens that presumes that the state law has not been preempted."  *Id.*  "[G]iven the historic police powers of the states, a court must assume that Congress did not intend to supersede those powers unless the language of the statute expresses a clear and manifest purpose otherwise."  *Id.*  When a challenged state law aims to protect public health and safety, the court must therefore construe any ambiguity in a preemption clause against preemption.  *Id.*  However, as GoodCat notes, that presumption does not apply where the state law in question bears upon an area with a history of significant federal presence.  *United States v. Locke*, 529 U.S. 89, 108, 120 S. Ct. 1135, 146 L. Ed. 2d 69 (2000) (finding presumption inapplicable because Congress, since "the earliest days of the Republic," has legislated matters of maritime commerce).

11.     The plain language of the Act expresses the State's purpose of protecting the health and safety of Indiana consumers through its own regulatory scheme for e-liquids.  Despite this traditional exercise of police powers, GoodCat argues—and neither Defendants nor Intervenors directly counter—that the non-preemption presumption does not trigger in this case because Congress has historically regulated the tobacco industry.  Congress first asserted its authority over the manufacture of tobacco products in 2009 with the enactment of the TCA.  *See* 21 U.S.C. § 387f(e).  And, effective August 8, 2016, the FDA's Deeming

Rule for the first time brought e-liquids within its sphere of regulatory authority over tobacco products.[4]  *Deeming Tobacco Products to be Subject to the FDCA*, 81 Fed. Reg. 28,974 (May 10, 2016).  GoodCat further suggests that Congress's long and active presence in the Tobacco industry, particularly with respect to product labeling and advertising, *see FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143–44, 120 S. Ct. 1291, 146 L. Ed. 2d 121 (2000) ("Congress has enacted six separate pieces of legislation since 1965 addressing the problem of tobacco use and human health."), forecloses operation of the presumption in this case.  Although the court doubts that the federal presence in the tobacco industry rises to the level GoodCat suggests, the court need not make this determination because, as explained below, Congress's expression of dominion over the manufacturing of tobacco products leaves little ambiguity for the court to construe.  *See Altria Grp., Inc. v. Good*, 555 U.S. 70, 77, 129 S. Ct. 538, 172 L. Ed. 2d 398 (2008) (affirming that courts must consider substance and scope of clause with a presumption disfavoring preemption "when the text . . . is susceptible of more than one plausible reading"); *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449, 125 S. Ct. 1788, 161 L. Ed. 2d 687 (2005) ("In areas of traditional state regulation, we assume that federal statute has not supplanted state law

---

[4]    Defendants devote substantial attention to the particulars of a consolidated action pending in the District Court for the District of Columbia, *Nicopure Labs, LLC v. FDA*, No. 1:16-cv-878-ABJ (D.D.C.), which challenges the FDA's Deeming Rule on constitutional and administrative grounds.  Defendants do not elaborate on the significance of that litigation, other than to suggest that this court should "wait and see" how it unfolds before deciding the merits of GoodCat's preemption claim.  The court disagrees.  *See Kraft Foods Holdings, Inc. v. Helm*, 205 F. Supp. 2d 942, 953 n.12 (N.D. Ill. 2002) (declining to stay proceedings pending the outcome of case before the Supreme Court which, one party argued, would resolve a circuit split on burden of proof required to show trademark dilution).

unless Congress has made such an intention clear and manifest." (internal quotation marks omitted)).

12.     As noted above, Section 387p(a) contains three clauses: a preservation clause, a preemption clause, and a savings clause.  Section 387p(a)(1) preserves states' traditional power to adopt any "measure relating to or prohibiting the sale, distribution, possession, exposure to, access to, advertising and promotion of . . . tobacco products, [or] information reporting to the State . . . ."  Congress limited states' regulatory power only to those areas not preempted in Section 387p(a)(2)(A).  That section prohibits states from enacting any measure "which is different from, or in addition to, any requirement . . . relating to tobacco product standards, premarket review, adulteration, misbranding, labeling, registration, [and] good manufacturing standards . . . ."  *Id.*  Despite the express preemption, the savings clause specifically exempts from preemption an otherwise preempted state law if it relates to "the sale, distribution, possession, [or] information reporting to the State."  *Id.* § 387p(a)(2)(B).  In essence, states retain broad power to regulate, and even ban, the sale of tobacco products.  *See U.S. Smokeless Tobacco Mfg. Co. v. City of New York*, 708 F.3d 428, 433 (2d Cir. 2013) (noting that although Congress prohibited the FDA from banning entire categories of products, the TCA did not extend that prohibition to the states).  As the Second Circuit observed, however, the preemption clause "reserves regulation at the manufacturing stage exclusively to the federal government."  *Id.* (distinguishing between a sales ban on tobacco products with certain characteristics and a product standard subject to preemption); *see also Indep. Gas & Serv. Stations Ass'n, Inc. v. City of Chicago*, 112 F. Supp. 3d 749, 754 (N.D. Ill. 2015) (same).

13.    The court now turns to GoodCat's contention that the Act's security requirements run afoul of Section 387p because they are "different from, or in addition to" the TCA's requirements relating to the registration, adulteration, premarket review, and good manufacturing standards of tobacco products.

### a.    Product registration

14.    The TCA requires that "every person who owns or operates any establishment in any State engaged in the manufacture, preparation, compounding, or processing of a tobacco product" must annually register business and contact information with the FDA and subject registered establishments to FDA inspections.  21 U.S.C. §§ 387e(b), (g).  This annual registration also requires manufacturers to provide the FDA complete lists of all tobacco products and copies of product labels.  *Id.* § 387e(i)(1)(b).  GoodCat argues that the Indiana Act's mandate that manufacturers certify compliance with the security requirements amounts to additional and different registration requirements within the meaning of the preemption clause.

15.    GoodCat's position fails for at least two reasons.  First, the court must not interpret "relates to" literally, for "everything in an open economy relates to everything else." *Lebamoff Enters., Inc. v. Huskey*, 666 F.3d 455, 457 (7th Cir. 2012).  The TCA requires a manufacturer to register as such and to provide the FDA with comprehensive product lists and corresponding labels.  The Act, on the other hand, requires a manufacturer to verify that it has a service agreement with an eligible security firm before it may sell e-liquids in Indiana.  To construe, as GoodCat does, the Act's security requirements as additional or different registration requirements within the meaning of the TCA would call into question

23

any state or local regulation that requires a manufacturer to verify its compliance.  In light of Congress's express reservation of regulatory power to the states, *see* 21 U.S.C. § 387p(a)(1), the court finds GoodCat's construction impermissibly broad.  Second, the Act's security requirements relate to the sale and distribution of tobacco products—i.e., a manufacturer may not sell or distribute e-liquids in Indiana without a permit—and therefore fall within the savings provision.  *See id.* § 387p(a)(2)(B); *U.S. Smokeless Tobacco Mfg. Co.*, 708 F.3d at 434 (finding no preemption of ordinance that bans sale of products with certain flavor characteristics); *see also Nat'l Ass'n of Tobacco Outlets, Inc. v. City of Providence*, 731 F.3d 71, 83 (1st Cir. 2013) (same).

### b.    Adulteration

16.    GoodCat's argument with respect to adulteration and premarket review fail for similar reasons.  Section 387b of the TCA directs the FDA to deem a tobacco product "adulterated" if, *inter alia*, it is "contaminated by any added poisonous or deleterious substance" or "it has been prepared, packed, or held under insanitary conditions."  GoodCat points to no FDA regulations promulgated to address the adulteration of tobacco products.  Rather, GoodCat directs the court to the Act's stated purpose of ensuring that e-liquids sold in Indiana are not contaminated or adulterated.  Because the Act's stated purpose involves protecting Indiana consumers from adulterated products, GoodCat argues, the security requirements constitute different or additional requirements relating to adulteration and therefore subject to preemption.  But the text of the preemption clause does not limit the purpose of state or local regulations of tobacco products; it applies only to specific measures imposing different or additional requirements.  *See* 21 U.S.C. § 387p(a)(2)(A)

24

("No State . . . may establish . . . *any requirement* which is different from, or in addition to, any requirement under the provisions of this subchapter . . . .") (emphasis added).  Thus, the clause does not operate unless the FDA regulates the adulteration of tobacco products, and GoodCat has not directed the court to any such regulations.  Additionally, as explained above, because the Act's security requirements function to limit the sale or distribution of e-liquids in Indiana, the savings clause applies.

### c.    Premarket review

17.    Section 387j governs premarket review.  For any tobacco products not commercially marketed as of February 15, 2007, a manufacturer must submit such products for premarket review and approval by the FDA before placing them in interstate commerce.  *See* 21 U.S.C. §§ 387j(a)–(b).  The application for premarket review must include a list of all components, ingredients, and additives in the product, and full descriptions of the manufacturing facilities and the processes used in its production.  *Id.* § 387j(b); (*see also* Filing No. 10-1 at 12–18 (detailing information to include in application for premarket review)).  GoodCat highlights the absence of security requirements from the information required for premarket review and concludes that, because a manufacturer could satisfy all the reporting requirements in Section 387j and yet fail to obtain authorization to sell e-liquids in Indiana, the Act's security requirements must be preempted.  This view, however, conflates the FDA's review of specific tobacco products before they enter interstate commerce and the measures a manufacturer must implement at its facilities before selling *any* e-liquid in Indiana.  The court finds the preemption clause inapplicable here.

25

### d.      Good manufacturing standards

18.      GoodCat's strongest argument for preemption lies in Congress's decision to vest the FDA with authority to regulate "good manufacturing standards" for tobacco products.  The TCA charges the FDA with prescribing regulations "requiring that the methods used in, and the facilities and controls used for, the manufacture . . . packing, and storage of a tobacco product conform to current good manufacturing practice."   21 U.S.C. § 387f(e)(1)(A).  GoodCat argues that the Indiana Act's security requirements relate to the "facilities and controls used for the manufacture . . . packing, and storage of a tobacco product," because any manufacturer wishing to participate in the Indiana market for e-liquids must have an eligible security firm willing to continuously monitor its manufacturing facilities.

19.      GoodCat relies on the Second Circuit's observation in *U.S. Smokeless Tobacco Manufacturing Co.* that Congress "reserve[d] regulation at the manufacturing stage exclusively to the federal government."  708 F.3d at 434.  In that case, the court considered whether a New York City ordinance banning the sale of flavored tobacco products amounted to a "tobacco product standard" preempted by Section 387p(a)(2)(A).  *Id.* at 433–45.  The plaintiffs argued that such a sales ban functioned as a product standard in the same way the California law governing nonambulatory pigs in *National Meat Association v. Harris*, — U.S. —, 132 S. Ct. 965, 181 L. Ed. 2d (2012) functioned as a production standard in violation of the Federal Meat Inspection Act ("FMIA"), 21 U.S.C. § 601 *et seq.* The law at issue in *National Meat* prohibited slaughterhouses from holding or processing nonambulatory pigs for food—proscriptions absent from the FMIA—and required

immediate and humane euthanasia.   The Supreme Court held that California's ban effectively imposed production requirements "in addition to, or different than" those under the FMIA and thus violated the FMIA's preemption provision.[5]  *Nat'l Meat Ass'n*, — U.S. —, 132 S. Ct. at 973 ("[Criminal proscription] is something more than an 'incentive' or 'motivator'; the sales ban instead functions as a command to slaughterhouses to structure their operations in the exact way the [California law] mandates."). Finding no preemption, the *U.S. Smokeless Tobacco* court distinguished New York City's ordinance from a product standard, explaining that although states and localities cannot circumvent preemption by simply framing a local standard as a sales ban, operation of the ordinance "depends on . . . [the] end product, and not on whether it was manufactured in a particular way or with particular ingredients."  708 F.3d at 434–35.[6]

---

[5]      The FMIA's preemption clause reads, in relevant part:

> Requirements within the scope of [the FMIA] *with respect to premises, facilities, and operations* of any establishment at which inspection is provided under . . . [the FMIA] which are *in addition to, or different than* those made under [the FMIA] may not be imposed by any State.

21 U.S.C. § 678 (emphasis added).

[6]      In *National Association of Tobacco Outlets, Inc.*, the First Circuit considered the preemptive effect of Section 387p on a Providence, Rhode Island ordinance similar to the New York City ordinance at issue in *U.S. Smokeless Tobacco*.  731 F.3d at 74, 81–83.  Although the court reached the same result as the *U.S. Smokeless Tobacco* court, it noted its disagreement with the Second Circuit's suggestion that a sales regulation may in effect, yet impermissibly under *National Meat*, regulate the manufacturing of tobacco products.  *Id.* at 83 n.11.  The *National Association* court explained that unlike the FMIA's preemption clause at issue in *National Meat*, Section 387p contains a savings clause that exempts sales regulations from preemption.  *Id.* Therefore, the court reasoned, whether a sales regulation impacts manufacturing has no bearing on the preemption analysis.  *Id.*  The court finds this reasoning persuasive in light of Congress's express reservation of states' authority to wholly ban entire categories of tobacco products.  21

20.    Even if the Indiana Act's security requirements (1) relate to good manufacturing standards, *see* 21 U.S.C. § 387p(a)(2)(A), and (2) do not relate to the sale or distribution of e-liquids and thus fall under the savings clause, *see id.* § 387p(a)(2)(B), the FDA's failure to promulgate *any* regulations pursuant to its statutory authority condemns GoodCat's preemption challenge.

21.    The parties appear to agree that the FDA has not issued product standards or good manufacturing practice regulations.  *See, e.g.*, 81 Fed. Reg. 28,974, at 29,003 (rejecting calls to delay the deeming rule until the FDA issues regulations for product and manufacturing standards; explaining that the agency needs more product-specific information by way of automatic registration requirements before promulgating such standards).  Nor has GoodCat provided the court any indication that new regulations will be forthcoming.  Furthermore, as Intervenors note, the FDA must satisfy certain review requirements before promulgating a new regulation, such as holding a hearing and affording an advisory committee reasonable time to submit recommendations.  *See* 21 U.S.C. § 387f(e)(1)(B).  Because the preemption clause in Section 387p triggers only when a state or local measure "is different from, or in addition to, any [federal] *requirement*," the clause cannot preempt the Indiana Act's security requirements.

22.    This conclusion finds reinforcement in *Freightliner Corp. v. Myrick*, 514 U.S. 280, 115 S. Ct. 1483, 131 L. Ed. 2d 385 (1995).  There, the Supreme Court considered preemption challenges to Georgia common law causes of action for negligent design

---

U.S.C. § 387p(a)(1); *see U.S. Smokeless Tobacco Mfg. Co.*, 708 F.3d at 433 (observing that the TCA prohibits the FDA—but not the states—from banning tobacco products).

defects in tractor-trailers unequipped with antilock braking systems.  *Freightliner Corp.*,
514 U.S. at 286.  The petitioner-manufacturers argued that the National Traffic and Motor
Vehicle Safety Act of 1966 ("Safety Act"), 49 U.S.C. § 30101 *et seq.*, expressly preempted
any state standard not identical to the federal standard.  *Id.*  Although the agency charged
with implementing the Safety Act issued a regulation concerning braking systems, an
appeals court suspended the regulation and remanded it to the agency for further
consideration.  At time of the litigation, the agency still had not taken final agency action
to reinstate the standard.  *Id.* at 285–86.

23.     Like GoodCat, the petitioners in *Freightliner* argued that "the absence of regulation
itself constitutes regulation."  *Id.* at 286; (*see* Filing No. 10 ("Pl.'s Br. Supp.") at 22 ("No
such security firm or 24-hour video monitoring requirements have even been suggested,
much less imposed, by the FDA.")).  The Court disagreed, concluding that:

> [T]here is no evidence that [the agency] decided that trucks and
> trailers should be free from all state regulation of stopping
> distances . . . .  Indeed, the lack of federal regulation did not
> result from an affirmative decision of agency officials to
> refrain from regulating air brakes.  [The agency] did not decide
> that the minimum, objective safety standard required by [the
> Safety Act] should be the absence of all standards, both federal
> and state.  Rather, the lack of a federal standard stemmed from
> the decision of a federal court that the agency had not compiled
> sufficient evidence to justify its regulation.

*Freightliner*, 514 U.S. at 286 (footnote omitted).  The FDA has clearly expressed its intent
to regulate manufacturing standards at some point in the future; but the undisputed fact
remains that no such standards yet exist.  Furthermore, Section 387p's preservation and
savings clauses underscore the lack of congressional intent "to centralize all authority over

the [manufacturing of tobacco products] in . . . the Federal Government." *See id.* For these reasons, the court finds that GoodCat is unlikely to succeed on its preemption challenge to the Indiana Act's security requirements.

### 2. Commerce Clause

24.     The Commerce Clause empowers Congress to regulate interstate commerce. U.S. Const. art. I, § 8, cl. 3. Although not expressly stated, the so-called "dormant" Commerce Clause implicitly prohibits state and local governments, even in the absence of federal legislation, from enacting laws that discriminate against or excessively burden interstate commerce. *See Comptroller of Treasury of Md. v. Wynne*, — U.S. —, 135 S. Ct. 1787, 1794, 191 L. Ed. 2d 813 (2015). GoodCat argues that the Act's security requirements impermissibly discriminate against out-of-state e-liquid manufacturers.[7]

25.     To prevail under the dormant Commerce Clause, the plaintiff must first demonstrate that a law burdens interstate commerce. *Alliant Energy Corp. v. Bie*, 330 F.3d 904, 911 (7th Cir. 2003). The parties do not dispute that since the Act took effect, fewer e-liquids manufactured outside Indiana now find their way onto store shelves in Indiana. Thus, the court must categorize this burden to determine the level of scrutiny to apply. *See Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1130–31 (7th Cir. 1995). Laws

---

[7]     The court notes that in *Legato Vapors LLC v. Cook*, No. 1:15-cv-761, 2016 WL 3548658 (S.D. Ind. June 30, 2016), the plaintiffs challenged the Act as an attempt to regulate commerce wholly outside of Indiana in violation of the dormant Commerce Clause. GoodCat does not make this argument. To the extent the *Legato Vapors* court evaluated the Act under the *Pike* balancing test, *see infra*, it did not consider—as the plaintiffs did not specifically challenge—the constitutionality of the security requirements as discriminating against interstate commerce. *See id* at *9–11 (finding evenhanded regulation that only incidentally impacts interstate commerce; and thus no violation of the dormant Commerce Clause).

affecting interstate commerce fall into three categories: (1) laws that explicitly discriminate against interstate commerce; (2) facially neutral laws that bear more heavily on interstate commerce than on local commerce; and (3) and laws that burden commerce but do not discriminate, either explicitly or in effect, against interstate commerce.  *Id.* at 1131.

26.    Laws that explicitly discriminate are treated as "virtually per se" unconstitutional. *Id.*; *see also Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338, 128 S. Ct. 1801, 170 L. Ed. 2d 685 (2008) ("A discriminatory law . . . will survive only if it 'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives' . . . ." (internal citations omitted)).  The Act does not fall into this category.

27.    Instead, the parties' dispute centers on whether the Act's security requirements have a disparate impact on interstate commerce and thus fall into the second category.  Even within this category, a facially neutral law may nonetheless function as a facially discriminatory law if it acts "as an embargo on interstate commerce without hindering intrastate sales." *Nat'l Paint & Coatings Ass'n*, 45 F.3d at 1131.  Courts will subject such laws to the same heightened scrutiny applied to laws that explicitly discriminate. *Id.*  By contrast, a law that regulates evenhandedly and has only incidental or indirect effects on interstate commerce must survive the *Pike* balancing test, whereby "[the law] will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S. Ct. 844, 25 L. Ed. 2d 174 (1970). Although no clear line separates the *Pike* approach and the heightened scrutiny for laws that more severely affect interstate commerce, "the critical consideration is the overall effect of the statute on both local and interstate activity."

*Alliant Energy Corp.*, 330 F.3d at 911–12 (quoting *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579, 106 S. Ct. 2080, 90 L. Ed. 2d 552 (1986)); *see also Lebamoff Enters., Inc. v. Huskey*, 666 F.3d 455, 460 (7th Cir. 2012) (noting the difficulty in categorizing and weighing effects on interstate commerce).

28.    If, as Defendants and Intervenors argue, the security requirements do not disproportionately impact interstate commerce, they fall into the third category of effects and the rational basis standard applies. *Nat'l Paint & Coatings Ass'n*, 45 F.3d at 1131; *see also Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 126 n.16, 98 S. Ct. 2207, 57 L. Ed. 2d 91 (1978) (finding no discriminatory effect where the "statute has no impact on the relative proportions of local and out-of-state goods sold in Maryland and, indeed, no demonstrable effect whatsoever on the interstate flow of goods").  As proof of no discrimination, both Intervenors and Defendants rely on the fact that two of the six permit holders reside outside Indiana.  Even more, one permittee, DNM Ventures, manufactures e-liquids in GoodCat's home state, Florida.  (*See supra* Findings of Fact ¶¶ 3, 43).  Thus, the argument goes, GoodCat cannot plausibly assert discrimination against non-Indiana manufacturers when one-third of the permittees have manufacturing facilities outside Indiana.

29.    The court finds differently.  Prior to the Act taking effect, 164 of the 177 businesses (more than 90 percent) selling e-liquids in Indiana were out-of-state businesses, (*see supra* Finding of Fact ¶ 62), and approximately 90 percent of the revenue from branded e-liquids came from e-liquids manufactured outside Indiana.  Fast-forward to present, and two-thirds

32

of the permittees producing e-liquids for sale in Indiana have Indiana addresses.[8]  This

reallocation of commerce among local and out-of-state firms, by itself, calls for greater

scrutiny than mere rational basis.  *See Nat'l Paint & Coatings Ass'n*, 45 F.3d at 1131.  That

two permittees reside outside of Indiana means only that the effect of the security

requirements did not amount to a complete ban on e-liquid sales from out-of-state

manufacturers.  GoodCat need not show complete discrimination to succeed on a dormant

Commerce Clause challenge.  *See id.*; *Hunt v. Washington State Apple Advert. Comm'n*,

432 U.S. 333, 351–53, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977) (finding discrimination

against sales of Washington apples where North Carolina law did not ban Washington

apples but it eliminated the competitive advantage Washington growers enjoyed vis-à-vis

North Carolina growers).

30.     This leaves the applicable standard somewhere between heightened scrutiny for

facially neutral but severely discriminatory laws and the tougher *Pike* balancing test.  The

court concludes that even under the *Pike* approach, GoodCat has shown a reasonable

likelihood of success under the Commerce Clause.  But first, more on discrimination.

31.     The Act provides that before any manufacturer can sell or distribute e-liquids in

Indiana, it must first obtain a manufacturing permit issued by the ATC.  To qualify for a

---

[8]     The court acknowledges its limited fact-finding at this early stage in the litigation.  Despite
having had an evidentiary hearing, the court and parties adhered to an expedited briefing and
hearing schedule due to the then-looming effective date of the Act's permitting scheme.  Thus, for
example, the court does not know whether or to what extent in-state manufacturers were
responsible for bringing e-liquid labels into Indiana from outside Indiana before or after the Act
took effect.  But because neither the Defendants nor Intervenors challenged GoodCat's assertions
or their significance, (*see supra* Finding of Fact ¶ 62), the court accepts them as true.

permit, the applicant must prove it has a services agreement with a security firm that meets the security requirements. (*See supra* Findings of Fact, Section C(1)). The rigorous security requirements resulted in a single security firm in the United States qualifying to provide security services to manufacturers. This firm, Mulhaupt's, operates exclusively in Indiana, (*see supra* Finding of Fact ¶ 30); has limited capacity such that it cannot do business with every e-liquid manufacturer who seeks to participate in the Indiana market (*see supra* Findings of Fact ¶¶ 38–39); and maintained complete discretion in deciding whom to contract with, (*see id.*; Pl.'s Exs. 9 and 10). Moreover, the Act precludes all other firms who failed to satisfy the requirements from ever becoming eligible to provide security services. (*See supra* Findings of Fact ¶¶ 24–25). Therefore, even though the ATC issued permits evenhandedly (i.e., any manufacturer with, *inter alia*, proof of a services agreement with an eligible security firm could obtain a permit) the Act effectively delegated a policy of economic protectionism to a private entity.

32. Defendants and Intervenors argue that GoodCat has no basis to challenge the security requirements because to the extent the Act discriminates against interstate commerce, it discriminates against other security firms—not e-liquids manufacturers. This argument misses the mark. The court sees no reason to limit its inquiry into "discriminatory effect" to whether a direct line of causation connects the State to the actual burden imposed on interstate commerce. The Act's security requirements are such that only one local firm can provide a state-mandated service for commercial access to Indiana's market for e-liquids. As one might predict, the lone firm's capacity in fact favors local commerce at the expense of interstate commerce.

34

33.    On the other side of the *Pike* balance, Intervenors and Defendants point to the court's observation in *Legato Vapors*:

> We start with the expressed "local benefits" of the Act, which are "to protect public health and safety" by ensuring e-liquids are "not contaminated or adulterated by [ingredients or substances] that might pose unreasonable threats to public health and safety."   [Ind. Code §] 7.1-7-1-2.   It is well-established that states have the responsibility to protect the health, safety, and welfare of its citizens and are afforded great latitude to do so.   The Supreme Court has explained that when applying Dormant Commerce Clause principles, a "common sense of our traditional recognition of the need to accommodate state health and safety regulation" exists.   We find that the local benefits provided by the Act relating to the health and safety of Indiana citizens are significant.

*Legato Vapors LLC*, at *19.   Although the *Legato Vapors* court acknowledged the legitimate ends of the Act's statutory scheme—the safety of Indiana consumers against intentional tampering and sabotage of e-liquid products—the court did not squarely address the security requirements or, more importantly, their *impact* on interstate commerce. GoodCat does not challenge the validity of the Act in its entirety, but rather the security requirements.

34.    Defendants highlight, for example, the benefits of a single security firm with W2 employees compared to a piecemeal security team consisting of subcontractors.   Beyond this, Defendants point to mere rational justifications for the remaining requirements, such as personnel certified in modifying commercial hollow metal doors.   In light of the burden imposed on interstate commerce as set forth above, the court finds that the burden on interstate commerce clearly exceeds any purported benefits.   As such, the court concludes

that GoodCat has a reasonable likelihood of succeeding on its claim under the dormant Commerce Clause.

### 3.   Due Process

35.   GoodCat also challenges the security requirements as a violation of the Due Process Clause.  For purposes of a preliminary injunction, however, the plaintiff need only present "a plausible claim on the merits" to show a reasonable likelihood of success.  *Hoosier Energy Rural Elec. Co-op, Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009).  Having determined that GoodCat has a reasonable likelihood of success on its claim under the Commerce Clause, the court's consideration of the merits ends here.

## C.   Balance of harms

36.   Absent injunctive relief, the court must determine whether GoodCat will suffer irreparable harm and, if so, the weight of that harm compared to any harm occasioned on the other parties.

37.   "Irreparable harm is harm which cannot be repaired, retrieved, put down again, atoned for . . . . [T]he injury must be of a particular nature, so that compensation in money cannot atone for it."  *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 296 (7th Cir.1997) (internal quotation and citation omitted).  Defendants and Intervenors argue that GoodCat has an available remedy for any harm through a final adjudication of this case.  The court finds otherwise.  Principles of sovereign immunity would preclude GoodCat any recovery against Defendants.  *See, e.g.*, *Cmty. Pharmacies of Ind., Inc. v. Ind. Family*, 801 F. Supp. 2d 802, 806 (S.D. Ind. 2011) (finding that the Eleventh Amendment would prevent the plaintiff from recovering money damages).  If the court denied preliminary relief, GoodCat

would have to withdraw its commercial presence in Indiana. GoodCat would incur lost profits during the pendency of this litigation and have no way to recover. More fundamentally, however, a reasonable likelihood of a constitutional violation, such as GoodCat alleges, rises to the level of irreparable harm for the purposes of injunctive relief. *Baskin v. Bogan*, 983 F. Supp. 2d 1021, 1028 (S.D. Ind. 2014) (citing cases).

38.     Because GoodCat seeks an injunction against enforcement of the security requirements as against GoodCat only, Intervenors' investment interests and concerns of any competitive advantage GoodCat might enjoy carry little weight here. First, as all parties agree, GoodCat has already invested substantial resources to comply with standards it expects the FDA to issue. Secondly, this Entry does not constitute a final ruling on the merits; it is merely the court's early, best analysis as to the merits of GoodCat's claims.

39.     Similarly, although Indiana has a valid and important interest in seeing that its laws are enforced, the balance of harm to the State or to Indiana consumers does not outweigh the very real and nearly certain economic harm GoodCat will incur absent an injunction.

### III. Conclusion

For the reasons set forth herein, the court finds that GoodCat has a reasonable likelihood of succeeding on the merits of its claim under the dormant Commerce Clause, and that, absent a preliminary injunction, GoodCat will suffer irreparable harm that would outweigh any potential harm to Defendants, Intervenors, or the public interest. The court, therefore, **GRANTS** GoodCat's Motion for a Preliminary Injunction (Filing No. 9). The court hereby **ENJOINS** the ATC from enforcing Indiana Code §§ 7.1-7-2-14, 7.1-7-2-

22(3)(B), and 7.1-7-4-1(d) against GoodCat.  The court further **ORDERS** the ATC to issue

GoodCat a manufacturing permit until GoodCat's claims reach final disposition.

**SO ORDERED** this 19th day of August 2016.

_____

RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.

38